FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### ALEXANDRIA CIVIL DIVISION

2009 NOV -6 P 3: 12

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |  |
|---|---|---|
| PETER GLASSMAN, | ) |  |
|  | ) |  |
| Plaintiff, | ) | Complaint |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| ARLINGTON COUNTY, VIRGINIA; ~~THE BOARD OF SUPERVISORS OF ARLINGTON COUNTY, VIRGINIA;~~ and BARBARA FAVOLA, JAY FISETTE, J. WALTER TEJADA, CHRIS ZIMMERMAN, and MARY HUGHES HYNES in their official capacities, | ) ) ) ) ) ) | Civil Action No. 1:09CV1249 |
|  | ) | Judge CMH/TRJ |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

## COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTION

### I.    INTRODUCTION

1.    Plaintiff brings this action against Arlington County and its Board of Supervisors, for funding the building of a Church, and for their excessive entanglement with and preferential treatment of the Church, in violation of the First Amendment of the United States Constitution and the Virginia State Constitution.

2.    This case presents a remarkable example of a state actor taking unprecedented steps to promote, sponsor and fund the demolition, rebuilding and renovation of a Baptist Church with taxpayer money.  The County is poised to supply and administer millions of dollars in funds and loans, infrastructure support and county resources to complete a construction project that will be punctuated by a Baptist Church's signature religious steeple, a rebuilt house of worship, religious sanctuary, choir rehearsal room and chapel.

3.     The County invokes affordable housing as the stated rationale to support this almost $50 million project. The Church itself will make no cash contribution. The $46 million in government credits, funds and loans required for the Church renovation would yield only 70 affordable housing units in the Church's building – and even then for a finite term of 75 years – at an eye-popping and unprecedented government investment of over $666,000 per affordable housing unit, most of which are only one-bedroom or smaller units. Given that similar units in the vicinity sell for substantially less, it is apparent that the affordable housing rationale has been used to mask what is really a subsidy from the County to support the building of the Church, at the expense of the affordable housing cause.

4.     The County's subsidies to the Church only amplify the degree to which the County's actions are entangled with and favor the Baptist Church project over private and commercial developments. The physical layout of the renovated building alone reflects an unmistakable religious overtone. The 70 affordable housing units (as part of a 116 unit residential complex) will sit literally in the middle of the Church's new structure. The 70 units will sit on land owned by the Church. The building lobby and entrance will be within the Church portion of the property, and will be shared with the Church. The housing units will be sandwiched between the Church's newly-built sanctuary on one end of the structure and the Church's renovated educational wing on the other. The housing units will share with the Church a common foundation, common elevator, and other common infrastructure such as piping and walls, all of which will be wrapped together in a brick and mortar structure occupying its own block of land owned by the Church. Residents who receive the county-subsidized affordable housing will be chosen by a Board dominated by Church-appointed members, with the active participation of a representative of the County. To enjoy their subsidized housing, those

2

8.      Further, through this joint development project with the Church, Arlington County has become excessively entangled with the Church. Arlington County has been the Church's development partner and supporter throughout the development process. The County granted unprecedented zoning variances to benefit the Church, acting (in the words of the Virginia Supreme Court) arbitrarily and capriciously in violation of Arlington's own zoning ordinances. It has approved unprecedented levels of County funding to the project in amounts that are not supported by the value of the property being built. It has even appointed a County representative to sit on the Church-dominated Board of the not-for-profit entity – The Views of Clarendon Corporation – that will oversee the construction of the building that will house the Church.

9.      Through the above conduct and through innumerable other steps (laid out below) to help the Church obtain funding for the Church development, the County has given the Church preferential treatment beyond what the County has granted to any other private developer. The result is that the County has created the appearance, and the reality, of providing State and County funds and support for the Church's development and operations. By funding the construction of the Church, and by authorizing the County to levy taxes on residents and developers used to fund the erection and repair of a house of public worship, the County and its Board have violated the Virginia Constitution. Further, through the conduct outlined above (and below in greater detail), the County has become impermissibly entangled with the operation of the Church and has violated the First Amendment of the United States Constitution.

## II.      JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, because this is a civil action claiming, inter alia, violations of the First Amendment to the United

States Constitution and the Virginia State Constitution. Plaintiff's action for declaratory relief and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

11.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b) because this is the district in which all, or a substantial part, of the events or omissions giving rise to Plaintiff's claims occurred.

### III.   THE PARTIES

12.     Plaintiff Peter Glassman is a resident, citizen, property owner, and taxpayer of Arlington County, Virginia. Mr. Glassman lives in the neighborhood abutting the Church, less than one block from the Church property. The real estate taxes levied against Plaintiff and other Arlington County real estate developers and owners constitute a substantial portion of Arlington County's budget. On information and belief, as much as 80% of the monies used to fund the Arlington Affordable Housing Investment Fund ("AHIF") – which is providing $13.1 million in loans for the building of the Church – come from the Arlington County budget. Therefore, Plaintiff pays taxes that, in part, fund the AHIF program, which in turn is funding the building of the Church. Plaintiff has an immediate, substantial pecuniary and constitutional interest in AHIF monies, the loan being made through the County AHIF program (the "Loan"), and the County Board's decision to approve that Loan. Mr. Glassman is also not of the Baptist faith, and has a substantial grievance concerning the County and State's financing of a Baptist Church building less than one block from his home. Given his proximity to the Church, he is personally affected by the building of this new structure.

13.     Defendants Barbara Favola, Jay Fisette, J. Walter Tejada, and Chris Zimmerman were members of the County Board on October 23, 2004, when the County Board first approved

the Loan. They were also members of the Board in February 2007, when the Board voted to increase the amount of the Loan. Defendants Barbara Favola, Jay Fisette, J. Walter Tejada, Chris Zimmerman, and Mary Hughes Hynes are the current members of the County Board and were members of the Board in December 2008 when the County voted to again increase the amount of the Loan. The aforementioned individual members are sued in their official capacities as members of the County Board. Those members, through and as the County Board, are responsible for determining recipients of AHIF monies.

14.     Defendant Arlington County, Virginia, is entrusted to manage and disburse AHIF monies as directed by the County Board, including the disbursement to the Church and its agents.

15.     Defendant Arlington County, its Board and/or the Board's members also have supported the Church and its consultants in obtaining other public funds allocated to the Church project, including (a) funds provided through a state-sponsored entity (the Virginia Housing Development Authority ("VHDA")) – in the amount of $15.2 million; and (b) funds from the Low Income Housing Tax Credit ("LIHTC") program funded by Federal Government tax credits; those credits, awarded by the State, account for $18.4 million of funding for the Church property.

## IV.     FACTUAL ALLEGATIONS

**A.     <u>Church Develops Strategy to Obtain Financing for New Church Building</u>**

16.     In or around 2003, the Church determined that it needed to renovate or rebuild its Church building. It also determined that it could not afford the necessary repairs, renovations, and systems upgrades for the physical facilities. On information and belief, the Church could not obtain commercial financing to meet its financial needs.

6

17.     The Church therefore devised a strategy by which it could finance the rebuilding of its Church through public funds. The Church decided to make the provision of affordable housing part of its religious mission, and it proposed a plan to develop a new Church facility using Arlington County's Affordable Housing Investment Fund ("AHIF"), together with other publicly funded sources, including Low Income Housing Tax Credits ("LIHTC") (administered by the Commonwealth of Virginia) and loans offered by the Virginia Housing Development Authority ("VHDA"). In 2004, the Church incorporated into a nonprofit corporation, partially to take advantage of the public funds potentially available for the Church redevelopment project. Upon information and belief, the Church's Articles of Incorporation state its express and singular purpose "to be a community that lives by faith, is known by love, and is daily growing to be more like Christ." The same Articles of Incorporation provide for an Initial Board of Trustees of the Church. Certain of these Church Trustees would later become members of the supposed "independent" nonprofit Board of The Views Corporation, which the Church created ostensibly to build and manage the affordable housing units separately from the Church.

18.     The Church's proposal eventually included the development of a new high-rise ten-story building, a new two-story Church sanctuary and place of worship, a Church classroom and community room, and a renovated educational center that would be used for religious activities as well as to house a day care center, the cash receipts from which, on information and belief, would continue to fund Church operations. Importantly, the Church's design team went to great lengths to retain its signature large religious steeple in the new structure, which would continue to distinguish the front entrance through which members of congregations pass to enter their house of worship.

7

19.     Under the Church's proposal, above the Church there were to be several floors of luxury apartment units designed to generate cash flow for the new building, and several floors of affordable housing units.  The Church was to be built on top of a three-floor parking garage (which provides parking for the apartment units), and the Church and apartment units were to share a lobby space.

**B.      County Approves Church's Proposal**

20.     In 2004, the Church submitted this proposal to the County.  The Church's plan called for developing the Church building, together with 116 apartment units, 46 market-rate units, and 70 affordable housing units.  The Church created a nonprofit affiliate corporation – ultimately called the Views of Clarendon Corporation ("Views") – which would be responsible for overseeing the apartment complex, including its building, leasing, and maintenance.

21.     The 7-person Board of the Views would contain three Church members, including a President who simultaneously served as a Church Trustee and Chair of the Church Redevelopment Team.  The remaining four members of the Views Board would include three Affordable Housing Advocates and a member appointed by the County.

22.     During a public meeting in December 2008, the Church initially claimed that the Board would not contain more than three Church members, but reluctantly acknowledged that one of the three Affordable Housing Advocates was a Church parishioner.  Although it was already clear that the three Church representatives on the Views Board, including the President, were not independent and would affect disproportionately the management of the affordable housing units, the presence of the fourth Church member on the 7-person Board solidified that fact.

8

23.     In 2004, the Church estimated the cost to develop the building would be $30.6 million.  Almost 20 percent of that initial funding amount was comprised of $5.8 million that the Views – funded by County, State and Federal Funds – would pay to the Church to acquire the "air rights" over the Church.

24.     The County commissioned a financial analysis of the Church's proposal by Bay Area Economics ("BAE").  That analysis demonstrated that the Church land as currently zoned was worth only $1.1 million.

25.     The BAE study noted that the value of the Church property could be increased to $10.5 million if the Church were demolished, the site were rezoned to C-R, and a condominium unit were placed on the Site.  But the Study concluded that such development would entail the loss of the subsidized day care center associated with the Church, and the "other community benefits" provided by the Church.  The Study also noted that Commercial development of the full Church site would not provide an adequate return to attract developer and investor interest.

26.     The BAE study also evaluated twelve potential design options for the building. BAE noted that the key to measuring the feasibility of any option is its ability to repay the loans issued to finance the project.   The BAE study concluded that the Proposed Design (the design ultimately approved) would not repay the County's $4.5 million loan within a 40-year period, having a balance of $1.1 million at the end of that period.

27.     Notwithstanding the BAE study conclusions, the County Manager recommended approval of the Church's Proposed Design.  In evaluating the various options, the County Manager concluded that the Church's Proposed Design "is the only alternative that meets the dual objectives of producing a financially viable and efficient affordable housing program, *while*

9

*producing sufficient capital and revenue and income to meet the [Church's] needs.*" The County Manager noted that "No other alternative generates enough capital or revenue to allow the FBCC to complete its renovation." The County Manager noted that other scenarios would require substantially larger AHIF contributions, which could not be recommended. The County Manager concluded that in other options considered, the County's participation "effectively becomes a grant that is not repaid."

28.     Although lacking in any publicly-documented support, the County Manager determined that the value of the air rights to be purchased from the Church was $5.8 million, which, coincidently, is the amount estimated for the Church to rebuild its sanctuary, Steeple, and other Church properties.

29.     Under the Church's 2004 proposal, the $30.6 million to fund the Church would be paid through LIHTC (managed by the State, using Federal funds) ($9.4 million), County AHIF funds ($4.5 million), VHDA loans ($1.5 million), a private mortgage ($13 million), and other sources ($2.2 million).   The County Manager specifically noted that the private mortgage lender will perform a comprehensive loan underwriting review, and the failure to meet that underwriting review (among others) would result in the project not moving forward.

30.     The County Manager noted that the $4.5 million in AHIF funding resulted in a subsidy of $64,000 per affordable unit, which was almost double the subsidy provided on other AHIF projects (which was $35,000), and represented two-thirds of the total value of affordable housing units at that time (approximately $100,000 per unit).   The County Manager also estimated that the County AHIF funds would require 45 years to pay back (longer than the 40-years deemed key to measuring the feasibility of the project by BAE).

31.     On or about October 23, 2004, the Arlington County Board approved a conditional commitment of $4.5 million in AHIF funds for the project.

## C.     County Approves Zoning Changes in Violation of its Own Zoning Rules

32.     A significant hurdle to the Church's plan was that the Church's existing zoning did not permit the Church to develop a ten-story building, and without building to ten stories, the Church's proposed development would not be economically viable. Thus, in 2004 the Church requested that the County change its zoning and approve a site plan to accommodate a ten story building.

33.     The Church's proposal raised concerns by those living near the Church, who believed that the proposed building towered over nearby homes. Despite several meetings to discuss ways of alleviating the Community's concerns, the Church and the County rejected the Community's concerns and proposals.

34.     The County approved the Church's proposed zoning changes.

35.     The County's zoning decision was challenged in Virginia state court. In September 2006, the Virginia Supreme Court ruled that Arlington County had violated its own zoning ordinances. The Virginia Supreme Court unanimously determined that despite "the presumptive reasonableness" of legislative action generally in the form of rezoning, in this case Arlington County "acted in direct violation of [its zoning ordinance in approving the Baptist Church's re-zoning application]. . . its action was arbitrary and capricious, and not fairly debatable, thereby rendering the re-zoning void and of no effect."

36.     Rather than modify the site plan to conform with its existing ordinances, the Arlington County Board changed its ordinances to permit it to make the type of zoning and site

11

plan changes necessary to permit the Church's development. The County's revised zoning changes were specifically targeted to benefit the Church; only three other blocks in all of Arlington County are affected by the zoning change.

37.     Another legal challenge to the zoning changes followed. By April 2008, the Virginia Supreme Court denied the Plaintiff's petition for rehearing.

## D.     Church Seeks Additional Financial Assistance from the County

38.     In February 2007, the Church again sought additional funding from the County to build the Church, citing an increase in the costs needed for construction (to $41 million). Among other items, the Land Acquisition costs to be paid to the Church increased to $6.1 million.

39.     Apparently, without conducting any further financial analysis of the project feasibility, the County Board, in a 4-1 vote, approved the increase of County AHIF funding by $2.1 million, for a total funding of $6.6 million. Other governmental funding sources, including the VHDA loans and the tax credits also increased at this time.

40.     The one dissenting Board member in 2007, Paul Ferguson, in voting to oppose the funding, was quoted as saying that "I have some angst and reservations about the County partnership to keep the Church going. "

41.     By fall of 2008, the Church's plans were again in jeopardy. The Church now estimated that construction and other costs had risen to almost $50 million, and the Church did not have access to sufficient funds. The Church again went to the County for additional assistance to finance the building of the Church, and its attendant apartment units.

42.     The County again obliged. The County doubled its total AHIF funding, adding $6.5 million to the $6.6 million already committed to the project. Other government-sponsored

12

funding, including the LIHTC tax credits also increased (by $3.2 million). Notably, the first mortgage on the property declined by nearly 20 percent. As a result, the County funding ($13.1 million) for the project now exceeds the funding from the first mortgage ($11.7 million).

43.     The County manager noted in recommending the Church's proposal that based on $13.1 million in AHIF funding, the AHIF subsidy per unit would be $186,535, far greater than the value that the County assigned to each affordable housing unit in its 2004 assessment. The County apparently did not commission any additional financial analysis to support such a generous financial commitment.

**E.   Church Attempts to Meet Other Funding Criteria, and Prepares for Construction**

44.     Even after the approval of the additional funds from the County, the Church was still not ready to begin construction on the new building. For one, it still had to finalize its financing, which, during the recent market turmoil and credit market meltdown, was challenging.

45.     Further, the Church had to meet other conditions before it could begin demolition and construction. One of those conditions was that the Church find a place to relocate the child development center (CDC) in the Church's educational building before it could evict the children during the construction period.

46.     By September 2009, the Church had been unable to meet even this requirement. The County again came to the Church's assistance. The County requested that the Arlington Public Schools permit the day care students to use Arlington Public School facilities located nearby for the remaining seven months of the school year, and agreed to "work with the CDC" and Arlington Public School System to find another acceptable location if the temporary, 7-month lease could not be renewed at the new location. While even that uncertain commitment

13

calls into question whether the site plan has been met with sufficient specificity to this very day, that ambiguity has not prevented the County from forging ahead on the Church project over the objection of certain parents of children in the CDC.

47.     Upon information and belief, the child development center continued to operate in the Church's educational building until the last week of October 2009. Thus, it has only become apparent recently that the Church would in fact proceed in the construction of its new Church facility.

**F.      State and County Funding Being Used to Fund the Church Building**

48.     The State and County are providing nearly all of the funding for the Views, and by extension, for the erection of the Church. Those funds come in the form of County AHIF funding, VHDA funding administered by the State, and LIHTC tax credits, also administered by the State.

49.     The County AHIF funding is funded through County contributions (based on property and other taxes assessed on county residents), and through taxes and other levies imposed on developers. The State General Assembly specifically authorized the imposition of such levies on developers. *See* SB 273 enacted in 2006.

50.     On information and belief, the VHDA funding is administered by the VHDA, a quasi-governmental organization, supported by the State.

51.     The LIHTC tax credits are also administered by the State. By approving LIHTC credits to be used by the Church, the State authorized the levy of Federal taxes to be used for the erection or repair of a house of worship.

14

52.     Although purporting to finance only the affordable housing portion of the building, the County and State funds are in fact funding the building of the Church.

53.     Based just on the drawings of the structure – which requires a color-key to determine where the Church begins and the Views ends – it is clear that the costs of constructing the Church will be wholly intertwined with the costs of constructing the remainder of the building. Indeed, the Church will sit on the foundation of the parking garage developed and owned by the Views. Yet, there is no apparent mechanism for compensation from the Church to the Views for the use of this foundation, or to compensate for the costs foregone by the Church in not having to dig and build the foundation. The Church and the Views apartments will also share at least one common entrance and lobby, common bathrooms, a common elevator, and common infrastructure and integrated systems, such as plumbing, heating, ventilation, and air conditioning, and the very walls themselves. The Church on one side, the Church's educational wing on the other, and the apartments squeezed vertically in between, will all be wrapped in a single brick and mortar structure, occupying its own block on land owned by the Church and punctuated by the highest point of the unified structure – the apex of the Church's signature religious steeple. Upon information and belief, attached as **Exhibit A** to this Complaint is an accurate front and lateral color rendering of the planned construction project.

54.     One recently obtained document reflects that the developer, who is charging a $5.5 million fee related to the building of the residential units, agreed to serve as the developer for the Church space for no additional fee if the Church spaces were completed simultaneously with the residential units.  In this way, the Views is further subsidizing the building of the Church.

15

55.     Further, as noted above, on information and belief, the amount paid to the Church to purchase the "air rights" likely far exceeded the true value of those rights. Rather, the value assigned to the rights was set based on the amount needed by the Church to rebuild its sanctuary. Indeed, the County itself artificially enhanced those "air rights," creating them out of whole cloth through the manipulation of its zoning laws, manufacturing just enough "value" to make this project work financially. In this fashion, the County, through the Views, directly subsidized the building of the Church.

56.     Other documents obtained through FOIA requests reflect a long-held determination by the Church and its advisors to funnel the public funds to the Church. One email noted that under one planning scenario "there is a short fall on the [Church] side ($349,013). . ." It then states, "This is obviously a gap that has to be filled through AHIF – but then we have to figure out how to make the transaction work without the County appearing to subsidize church costs." The email concludes that "Once everyone has reviewed and made changes, the portion [of the spreadsheet] on the bottom that tracks Church costs should be deleted before forwarding."

57.     Another email notes that "Another 'hurdle' is how to use AHIF to pay the Church's build-out costs. . ."

58.     Even County personnel appear to be complicit in this effort to misdirect public funds. In one email from the County, the County's Housing Development Coordinator stated "For hopefully the last time, please take the church costs out of these spreadsheets," because the spreadsheets were about to be shared with another county subcommittee.

59.     On information and belief, Plaintiff believes that after additional opportunity for discovery, even more evidence will emerge demonstrating that State and County funds are being used directly to fund or subsidize the building of the Church.

60.     Indeed, the Church appears to be investing little of its own funds to build the Church, which is being funded almost exclusively from public sources.  Assuming that the government-subsidized loans are ever paid off, on information and belief the Church will also be the deFacto owner of the Views residential property, with access to the perpetual funding mechanism that the property provides.

G.      **County is Impermissibly Entangled in Church Matters**

61.     The County's conduct over the past five years alone reflects the degree of its entanglement with the Church.  The County has repeatedly bailed the Church out with ever larger (taxpayer funded) contributions to the Church.  The County has also worked with the Church to help the Church obtain funding from State and other sources.  The County has granted the Church favorable zoning variances, even in violation of its own zoning ordinances, in order to enable the building of the Church.  And, on information and belief, the County even funded costs of litigation incurred by the Church during litigation related to the zoning of the property.

62.     The County's excessive entanglement will continue.  The Loan from the County calls for one or more County representatives to sit on the Board of the Views of Clarendon.  That Board is dominated by members of the Church, who have the right to select their own successors into the future.  That Church-dominated board, on which the County representative will sit, will be responsible for, among other things, supervising the construction of the building, and determining which applicants will be granted access to renting the subsidized affordable housing at the building.  If the Church members favor renters of a particular set of beliefs (or is even

17

perceived to do so), the County Board's representative will be perceived as supporting such conduct.

63.     The County Board has characterized the ongoing relationship with the Church as a "partnership," even as the Church states that its affordable housing development is "an extension of its ministry."

64.     Moreover, even the efforts (if any) taken by the County Board representative and the County to ensure that State and County funds are not used for Church purposes – an effort that will require substantial monitoring – will lead to the perception that the County is excessively entangled in Church activities.

## H.     The County is Giving the Church Preferential Treatment

65.     The County's conduct demonstrates a substantial preference being shown to the Church's project that has never been afforded to other projects.

66.     As noted above, the County approved a site plan in violation of its own zoning ordinances to benefit the Church. After that change was struck down by the Virginia Supreme Court, the County amended its long-standing ordinances to allow the Church project to move forward – a benefit that on information and belief has never been extended to private developers.

67.     The County has tripled its AHIF contribution to the Church, from $4.5 million to $13.1 million. On a per unit basis, the County's contribution will be approximately $87,000 per unit, which is substantially greater than any other AHIF contribution in any other project.

68.     The total public funding for the building amounts to approximatley $666,000 per affordable housing unit. This amount far exceeds the fair market value of those units, given that similar spaces in other buildings in the area sell for far less.

18

69. Moreover, the underwriting assumptions used to support the County's loan amount makes assumptions that are simply not supported by market conditions. The County would never accept such "optimistic" assumptions from a private developer. Yet, the County has accepted these assumptions from the Church, even though the County in 2004 recognized that the AHIF funds would "effectively become a grant that is not repaid." That conclusion is practically guaranteed after the County tripled its AHIF contribution.

70. The County's preferential treatment of this Church-sponsored development has deviated in other respects from its own funding guidelines. For example, while the AHIF website states that it seeks funding leverage of 5:1, the Church project achieves little more than half that amount – a 2.8:1 funding leverage. The County has also extended the payback period of the loan to 40 years, which is well in excess of the standard 30-year repayment term for similar loans.

71. Similarly, even though the County's original 2004 approval of the project stated that it would not proceed forward unless the project met the underwriting requirements of the private lender, the County is now proceeding with the project even without any private lender participation, and even though the County's loan now exceeds the amount being provided in the first mortgage.

72. The County has also indicated that it is willing to forego contributions that it typically requires from private developers, and will forego the requirement imposed on private developers to underwrite the County's construction cost of new sewer and other facilities supporting the new building.

19

73.     In short, the County has given the Church preferential treatment over that given to private developers, and at the least, creates the appearance of supporting the Church's activities.

I.     **The County and Church Have Been on Notice of This Unconstitutional Conduct for Five Years and Have Failed to Correct It**

74.     This is not the first time that the concerns raised in this Complaint have been raised to the County and its Board.

75.     From the date of the application for the Church development, Arlington County residents and civic associations, as well as the national watchdog organization Americans United for Separation of Church and State, entreated the County Board not to approve the application on numerous grounds, including the fact that the Loan and other entanglements described herein would breach the constitutionally-required separation between Church and State.

76.     In the opening of a 2004 letter from Americans United for Separation of Church and State ("AU"), the organization wrote, "This arrangement would create a host of constitutional problems. Therefore, we are writing to provide you with the legal guidelines that govern transactions of this kind and to urge you not to approve the loan."

77.     AU noted that "[b]ecause the Church plans to place the affordable-housing units in a church building that is used for religious worship, there is a strong possibility that government funds will be used for the construction, improvement, or repair of Church facilities that are used for religious purposes. An explicit restriction prohibiting the use of the loan funds to pay for construction of the facilities would not be sufficient to make the proposed loan constitutional, because intense government monitoring would be required to ensure that the Church adhered to the restriction, and such monitoring would excessively entangle the government with religion."

78.     AU cited a number of factors – including the unprecedented loan amount per unit and repayment terms – as creating "the unconstitutional appearance of a religious preference, because the County would be extending a benefit to a particular church that has never been afforded to other groups, religious or secular."

79.     AU also described as "constitutionally troubling that the income generated by the affordable-housing units that would be financed by County dollars would go to the Church to further its religious mission."

80.     AU concluded that the project would "violate the longstanding, elemental proposition that public monies cannot be used to build or renovate a church," and concluded that the project would be unconstitutional.

81.     Notwithstanding this warning from AU, the County and its Board members voted to approve the funding of the project.  In fact, the then-County Board chairperson stated that the project would serve as a model for other development projects in partnership with churches in Arlington County.  To AU, this statement was "disturbing."  It noted that "the use of government funds, earmarked to create affordable housing for working families, to generate income to further the religious mission of a church surely subverts the purpose and meaning of the Establishment Clause."

## CAUSES OF ACTION

### Count I
### Violation of the First Amendment to the United States Constitution

82.     Each and every allegation contained in the preceding paragraphs is incorporated herein by reference.

83.     The Establishment Clause of the First Amendment to the United States

Constitution states, "Congress shall make no law respecting an establishment of religion. . . ."

The First Amendment applies to the Defendants through the Fourteenth Amendment to the

United States Constitution.

84.     Defendants' approval of the Loan has the primary effect of advancing religion, it

inherently defines the loan recipient, the Views at Clarendon, by reference to its religious nature

given the domination of its Board by Church members, and it fosters an illegal entanglement

with religion.  The Loan is an unprecedented distribution of public funds to the Church for the

demolition and reconstruction of a building, several floors of which will be used as the Church's

place of worship or in support of the Church's religious operations.  But for the Loan, with terms

that are extraordinary and preferential to the Church, the Church project would not be able to go

forward.  The resulting rental apartment units, acknowledged as an extension of the Church's

ministry, would generate income to pay off the financing of the demolition and rebuilding of the

Church, and would provide additional income to the Church in the future.  In fact, the public

funds are essential for the Church's continued survival by generating these cash receipts from

rental units and other operations in the renovated building.  The entanglement between church

and state is further aggravated by the provision that one or more County representatives become

voting members of the Board of Directors of the developer of the Church's new structure, and by

the County Board's own view that it has entered a "partnership" with the Church.

85.     By violating the Establishment Clause as set forth above, the Defendants have,

under color of statute, ordinance, regulation, custom, and/or usage, deprived Plaintiff of rights

secured by the First and Fourteenth Amendments of the U.S. Constitution, entitling Plaintiff to a

remedy under 42 U.S.C § 1983.

**Count II**
**Violation of the Virginia State Constitution**

86.    Each and every allegation contained in the preceding paragraphs is incorporated

herein by reference.

87.    The Virginia State Constitution, Article 1, Section 16, states:

That religion or the duty which we owe to our Creator, and the manner of discharging it,
can be directed only by reason and conviction, not by force or violence; and, therefore, all
men are equally entitled to the free exercise of religion, according to the dictates of
conscience; and that it is the mutual duty of all to practice Christian forbearance, love,
and charity towards each other.  No man shall be compelled to frequent or support any
religious worship, place, or ministry whatsoever, nor shall be enforced, restrained,
molested, or burdened in his body or goods, nor shall otherwise suffer on account of his
religious opinions or belief; but all men shall be free to profess and by argument to
maintain their opinions in matters of religion, and the same shall in nowise diminish,
enlarge, or affect their civil capacities.  And the General Assembly shall not prescribe any
religious test whatever, or confer any peculiar privileges or advantages on any sect or
denomination, or pass any law requiring or authorizing any religious society, or the
people of any district within this Commonwealth, to levy on themselves or others, any tax
for the erection or repair of any house of public worship, or for the support of any church
or ministry; but it shall be left free to every person to select his religious instructor, and to
make for his support such private contract as he shall please. (emphasis added)

88.    The Defendants violated the clear language of the Virginia State Constitution in

approving the Loan, by levying taxes and other fees that are used to erect and repair the Church's

house of worship and support the Church's ministry.  The Defendants' conduct confers peculiar

privileges and advantages on the Baptist Church, and compels Plaintiff to support the Church

through the use of funds from taxpayer contributions.  For the additional reasons expressed

above, including that the County funding excessively entangles it with religion under the U.S.

Constitution, the Defendants violated the Virginia State Consitution in approving the Loan and

by coordinating, supporting, and/or helping administer other public funds to benefit the Church's

construction project and ongoing operations.

23

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

a) Assume jurisdiction of this action;

b) On Count 1, declare that the Loan and the action of the County Board, both in approving the Loan, and in supporting the Church to obtain or administer other public funds to benefit the Church's construction project and ongoing operations, are in violation of the Establishment Clause of the First Amendment to the United States Constitution;

c) On Count 2, declare that the Loan and the action of the County Board, both in approving the Loan, and in supporting the Church to obtain or administer other public funds to benefit the Church's construction project and ongoing operations, are in violation of Article 1, Section 16, of the Virginia State Constitution;

d) Issue permanent injunctions against the Defendants, their agents, employees, and any persons acting in concert with them, from enforcing or giving effect to the Loan or from taking any action toward the construction of the Church Project (since any remedy at law would be inadequate);

e) Retain jurisdiction over this action until the County Board rescinds, and officially resolves never to approve in the future, the Loan and any other official actions or approvals associated with the Church construction project or any similar project in the future that would provide public funds toward the rebuilding of a church or facilities used for religious purposes;

f) Award all costs, expenses, and reasonable attorneys' fees incurred in bringing and prosecuting this action, both pursuant to 42 U.S.C. §§ 1983, 1988 and pursuant to

24

equity;

g) Make all further orders as are just, necessary, and proper to ensure complete fulfillment of this Court's declaratory and injunctive orders in this case; and

h) Provide other relief as the Court deems just and equitable in the circumstances.

This 6th day of November 2009.

Respectfully submitted,

*[signature]*

Stephen G. Cochran, Esq. (VSB#12956)
Roeder & Cochran, PLLC
8280 Greensboro Drive, Suite 601
McLean, VA 22102
(703) 749-6034
Fax: (703) 749-6027
stevec@roederlaw.com
*Counsel for Plaintiff*


Brian F. Chandler, Esq. (VSB#46730)
Brian F. Chandler, P.C.
8300 Greensboro Drive, Suite 800
McLean, VA 22102
(703) 752-3764
Fax: (703) 749-6027
brianfchandler@gmail.com
*Co-Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that I had the foregoing Complaint, with Summons, filed with the Clerk of Court, United States District Court for the Eastern District of Virginia, and personally served, by first class mail, postage prepaid and e-mail, on this 6th day of November 2009, on the following:

Counsel for Arlington County, the County Board, and the members of the County Board:

Stephen A. MacIsaac County Attorney
2100 Clarendon Boulevard, Suite 403
Arlington, VA 22201
smacisaac@arlingtonva.us

Chairperson of the Arlington County Board:
Barbara Favola
2100 Clarendon Boulevard, Suite 300
Arlington, VA 22201
countyboard@arlingtonva.us

Stephen G. Cochran, Esq.
Roeder & Cochran, PLLC
8280 Greensboro Drive, Suite 601
McLean, VA 22102
(703) 749-6034
Fax: (703) 749-6027
stevec@roederlaw.com
*Counsel for Plaintiff*

27